Good morning. May it please the Court, Ralph Casarda for AGC San Diego, and I would like to reserve four minutes for rebuttal. Caltrans' DBE program fails strict scrutiny and is unconstitutional. Caltrans imposes a one-size-fits-all racial preference to individuals who have not suffered harm and denies preferences to individuals who may have. Regardless of which disparity study Caltrans uses, Caltrans combines contract data, prime contract and subcontract data, as well as contract data from the construction and engineering. You know, you may pose a problem for yourself when you talk about individuals who have not suffered harm because it raises a question of whether you and your clients have suffered harm. Isn't there a requirement that there be some injury for you to have standing in this case? The we do have standing, Your Honor, and the Well, whether you have standing is a question that is before this Court for decision. It hasn't been decided, has it? No, it hasn't, Your Honor. So then you might want to go to the question of standing. I wouldn't have raised it so quickly, but when you talked about individuals who haven't been injured, I think that raises the standing question, because it can be argued that no member of your group has been injured by what is being done in this case. Can't it? Your Honor, AGC San Diego has associational standing. The three prongs for associational standing are that members can bring standing on their own, and that appears to be the only issue regarding standing. We have that. Who can bring an action on their own, but what members on this record have been injured? Your Honor, we have adequately alleged standing. Maybe. Maybe. We're going to have to decide whether you have adequately. Just a minute. That's interesting you would say the complaint. We're here on summary judgment, aren't we? We're here on summary judgment, Your Honor, however And Lujuan would say the allegations of the complaint are insufficient to satisfy the requirements of associational standing. So here we are. We're on summary judgment. We're not on a motion to dismiss. So we've got to have something more than allegations of the complaint, don't we? No, Your Honor. Because What case says we can go on mere allegations of the complaint? Northeastern Florida AGC v. Jacksonville. In that case, that's a Supreme Court decision, Your Honor. In that case, the summary, the parties had submitted cross motions for summary judgment. The Supreme Court held that because standing had been raised for the first time on appeal, the Court had to accept the allegations in the complaint as true. This Court similarly did the same thing in AGC v. CEE. Standing was raised for the first time on appeal, and this Court took the allegations in the complaint as true. If you look at the cross motions for summary judgment in this matter, standing was never raised. If you look at the transcripts of oral argument, which are in the record, standing was never discussed, not even once. Okay. If we – I wanted your argument. I wanted your argument about that because I'm going to ask your opposition party about that. If I don't have the allegations of the complaint, what's the only evidence I have? Then you have the declaration of Jim Ryan, who's the president of AGC. Which was struck to some extent. To some extent. However, as a – Do we know what was struck and what wasn't on this record? It's in the docket. I believe it's in the – Well, I've read the docket. I read the declarations. I'm having a struggle determining what parts of the declaration were struck, because the total of the declaration was about – or the total of the striking was about the strike foundation. And it seemed as if all of the statements, if there are any, by Mr. Ryan, that would be helpful to you, were struck. Well, I would respectfully disagree, Your Honor, and in our reply brief. Let me ask, you disagree because? Because, well, in our – Did you describe any place what was struck and what wasn't? In our reply brief, we did, Your Honor. Where? In our – in the second section of our reply brief, when we respond to the standing argument, we – I cite to the specific instances of Jim Bryan's declaration that were not struck. And I've put that – and I've made that clear in the reply brief. Let me ask you another question. Why is it we don't have any member declarations? In the former cases that have been argued by Associated General Contractors, it seemed to me like we had some member declarations, and the Court focused on the member declarations. Your Honor, in this case, standing was not attacked. Well, I understand, but to be fair, when we look at that former case and we look at what the situation was in that former case, it seemed to me that this is somewhat similar, and yet in the former case, there were no – there were declarations by the members. And in this case, we have one declaration. It's by Jim Bryan. Some of it struck. The part struck is subject to some dispute, I will suggest, and yet we're supposed to go on that. I would have thought somebody would have clarified exactly what was struck or not if one wanted to decide that case on standing. And so I'm looking for the place where I can go to find that. Well, Your Honor, I've cited two, the portions of Jim Bryan's declaration that were not touched by the district court's finding, and I've made that clear in our reply brief. So if I don't find it in the reply brief, I'm not finding it. Is that what you're telling me? Because I've looked very carefully at it. Well, I went through the motion to strike, which is in the district court docket, and I looked at every argument that was raised and the judge's ruling on which portions were struck, because only certain portions were challenged. I understand. I did pretty carefully. And looking at only at the sections that were challenged, there are still adequate items in his declaration to find standing. And that's what I've made clear in our argument. But as well, the, again, northeastern Florida AGC, the Supreme Court said we must accept the allegations and the complaint is true when the summary judgment motion was raised on the merits, but not on standing. And it's clear in the record that standing was just not raised on summary judgment. Right. The unfortunate thing for you, though, is that standing can be raised at any time. It's jurisdictional, so we have to take it straight up. I guess my question is, to get to the real substance of it, your claim is that because you have members that are ready, willing, and able to bid is enough for associational standing. Is that right? That's yes. So in fairness, what we have is a rugby force. There's no actual injury that's alleged to any of your members. There's not an allegation that they were discouraged from bidding, as in the case of AGC. What it says is they're willing, ready, willing, and able to bid. Is that what we have to analyze? No, that's definitely not all we have, Your Honor, because in the complaint, we talk about the racial preference that's given, the harm to various contractors that would bid, the harm that's caused by bidding on a – in a program that prevents bidding in an equal manner, the harm to prime contractors when they are forced to give out racial preferences. And this Court has held at AGC-CEE that there is a harm to prime contractors who are forced to bid. So we've alleged that also in the complaint. We've alleged the harm. In our complaint, pages 2, 3, 14, 16, and so on. Okay. Well, we'll take it for what it is. I just want to make sure I had a clear handle on your argument. So go ahead. Thank you, Your Honor. Regardless of which disparity study Caltrans uses, it combines the contract data from the construction and engineering industries and imposes the same identical preference to both industries, even though different industries have different disparities. Regardless of which disparity study Caltrans uses, Caltrans combines the contracting data from all 12 different Caltrans districts across the State and imposes the same one-size-fits-all remedy to local contracts, even though the disparities are different in each district. For instance, subcontinent Asian contractors receive no preference on local engineering contracts in the San Francisco area, even though there are disparities for subcontinent Asian contractors on local engineering contracts in most districts across the State. Did you present any evidence at the hearing as to the discrimination in this particular matter? Discrimination by Caltrans, yes, Your Honor. Well, what did you do? I mean, I understood you abandoned your expert witness. We did not abandon our expert witness, Your Honor. But we did not need him for the motion for summary judgment. There is adequate, Your Honor, we're making legal arguments. Strict scrutiny requires that Caltrans have a program which is narrowly tailored to discrimination. It doesn't. There is, it's horribly narrowly tailored. It's not narrowly tailored. Narrowly tailored, to be narrowly tailored, there must be an exact connection between classification and justification. As I've laid out here, there's no narrow tailoring on the construction subcontracts. There's no narrowly tailoring because Caltrans imposes a one-size-fits-all across the State in construction engineering subcontracts and on local assistance contracts in different parts of the State, even though the demographics of the State are completely different. For instance, District 4 here in San Francisco, there's no disparities for Asian construction contractors, but Asian construction contractors will receive a preference here in San Francisco. Why? Because discrimination is extrapolated in from other jurisdictions. That's a violation of Croson, and it's a violation of this Court's holding in Coral Construction v. King County. You cannot extrapolate inferences of discrimination from one jurisdiction into another, and that's what Caltrans does. That's what Caltrans does with the different industries, and that's what Caltrans does with the different districts. That's in the disparity study. Also, Caltrans' program is further overinclusive because it certifies minority women-owned businesses as DBEs to receive preferences. Without evidence, they have suffered any discrimination in California. That is also a violation of Croson, and it's also a violation of this Court's holding in Coral Construction v. King County. In King County, Coral Construction case, this Court held that to receive a preference, there had to be evidence of discrimination against that particular minority group in that jurisdiction, and there had to be evidence or some kind of finding that that individual firm suffered discrimination within that jurisdiction. And the Court said it wasn't an insurmountable burden. It did not require findings, you know, court findings for each particular case, but at least there had to have been some kind of finding that a particular firm to receive a preference suffered discrimination or suffered from the effects of discrimination in the jurisdiction. Here, the evidence is undeniable, and it's in the record. It's from Western States. Caltrans certifies DBEs to receive preferences even though they have not suffered discrimination in California. There's the point I had raised when you got started, and it may be a problem that you want to resolve, although you consider it of no consequence. You are arguing, and I think I understand your argument, and I'm suggesting that in order to make that argument, you have to be somebody who has been offended. You attempted to bid, and your bid was refused. And because your bid was refused because of the practice, and that isn't a part of this record, and that might be something you might be concerned about in order to have standing to make the argument you're trying to make. Your Honor, the Supreme Court in northeastern Florida. I'll assure you that we're going to be we recognize which Supreme Court matters to us, and I don't know. Well, the Supreme Court has held that the injury. Which Supreme Court? The U.S. Supreme Court has held. All right. Go ahead. That's the Supreme Court that matters to us. When you talk to us about the Supreme Court of Florida. I'm sorry, Your Honor. The northeastern Florida case was a. In a different circuit in the first place. When I say the northeastern Florida AGC v. Jacksonville, that is a U.S. Supreme Court decision. All right. That case held that the injury is not the denial of the bid. It's the bidding in a program which denies equal bidding opportunity. There's the court, this Court and the Supreme Court, U.S. Supreme Court, does not hold that you have to have suffered a denial of the bid to have standing in a challenge to a racial preference program. Also, this Court holds that a prime contractor can allege standing just by showing that the program will require that prime contractor to give racial preferences, to discriminate on the basis of race. That's an injury, in fact. So that's what we've alleged in the complaint. And the Supreme Court. All right. Go ahead. Okay. Okay, Your Honor. I will also talk about the differences in construction v. engineering industries. There's prime contracts and there's subcontracts in each industry. The evidence in the record is that prime contracts awarded by Caltrans are awarded in a low bid process and there was no evidence of discrimination. And Caltrans denied that there was discrimination by Caltrans in the prime construction contracts. Nevertheless, that data is mixed with subcontracting data to compile some kind of one-size-fits-all remedy, which only applies to subcontractors, and it doesn't fit. And that's the problem here. The program gives preferences where the disparities do not drive with the preference. And I've indicated that in our brief, for instance, in the subcontract. There were no disparities against Native Americans, Hispanic Americans, subcontinent Americans. They will receive the preference. But we have to ask ourselves, what does that do to remedy discrimination? If that – if they weren't receiving a preference before, but a contractor could still use those contractors to satisfy the DBE program, that's not eradicating discrimination against the other minority groups for which there is a disparity. This is a – this allows the status quo to continue. It doesn't remedy discrimination. And the problem is compounded because the disparities exist at each local level as well. For instance, the – at the Hispanic – well, I see that my time's up for rebuttal. But I would say, for instance, District 11 near the southernmost district, there's no disparities for Hispanics. However, Hispanics in another district, for instance, the northernmost district, there may be disparities for Hispanics, yet they will not receive a preference. So that's the problem here with narrow tailoring. Roberts. Thank you, counsel. Thank you. May it please the Court. Scott Emblidge and Catherine Papalia on behalf of the Defendant California Department of Transportation. I will be splitting my time with the Intervenors' counsel, Mr. Selstrom, so I'll take the first ten minutes. Very good. While this case would appear to raise some very important constitutional issues, it is, in fact, a fairly easy case to resolve. It's an easy case to resolve because it doesn't present an attack on the federal DBE program that Caltrans is implementing, nor does it present a fact-specific attack on the award of a particular contract where someone supposedly suffered a disadvantage. It's simply attacking whether Caltrans properly implemented the federal program which this Court and other courts have upheld as constitutional. And this Court has told us what we need to show in order to appropriately implement that program. We need to show that in California, not in District 11, in California, there is discrimination, or at least the inference of discrimination in the construction, transportation construction industry, and that we've constructed a program that does not violate those groups that have been shown to be suffering from the effects of that discrimination. To meet that standard, we compiled a huge record that you've seen of testimony, of studies, and a disparity study that is so unassailable that the AGC disclaimed any challenge to its methodology in its summary judgment motion. So with that evidence on the one side, what's on the other side? Nothing. No evidence whatsoever presented to show discrimination, to undermine the findings, to undermine the program. With that kind of record, this Court should easily reach the conclusion that the district court should be affirmed. Now, our ---- Scalia. It generally seems in reading what counsel has suggested in the briefing that Caltrans should identify intentional or specific acts of discrimination. That it's not enough to do what you have suggested you've done. How do you respond to that? I understand that that's the AGC's political argument. That's their ideological position. But it's not the law. That position has been rejected by the Supreme Court in Croson. It's been rejected by this Court in AGC 2. It's been rejected by the Fourth Circuit in Roe. And by the Tenth Circuit in Concrete Works. No court has ever adopted the position that Caltrans would need to show that there was specific acts of discrimination. I'm not going to ---- I'm not going to ---- I'll tell you, Caltrans, I'm not going to use that subcontractor because I don't like his race. Of course that's not the standard. No court has ever said it is.  which we have here, anecdotal evidence and marketplace studies, that raise an inference of discrimination in the industry. And here the disparities are stark. We've shown a 59, a .59 disparity for women-owned businesses. Meaning if it is 100, that means women-owned businesses are getting contracts at about the rate you would expect based on their availability. Their disparity ratio is 59. Okay. So we ---- the evidence, which is unrebutted, clearly shows that threshold disparity level. Then it's supported by the other aspects of the study, both from the anecdotal evidence and from the marketplace issues. I want to address the standing issues that the Court raised. Maybe we ---- you should talk about Croson. I call it Croson. Maybe it's Crosson. Richmond v. Croson. Doesn't that case by itself, the 1989 case, doesn't it challenge what you're saying in this particular instance? No, Your Honor. I think it actually supports it 100 percent. I call it Croson, too, although I've heard people call it Croson. Okay. Why don't you just say Richmond? Pardon me? You can just say the City of Richmond. The City of Richmond case. Okay. There you had a broad program by the City of Richmond saying we want to address discrimination, and they gave bid preferences to contractors, and they did that with really no evidence at all. They gave it on a broad range of contracts to a broad range of minorities, some of whom the Supreme Court accurately noted probably don't even reside in the City of Richmond. And they ---- the statistical disparities they had were only rough statistical disparities between the contractors and the general population. What Croson did was it started a new way of looking at these programs that is culminating in this oral argument today, refining those types of studies that need to be done. And it gave the guideposts for those studies. It said you need to look at the right ---- you need to be comparing apples to apples on statistical disparities. You need to be looking at the actual minority contractors who are ready, willing, and able to do the contracts and compare that to those that are actually selected for the contracts. That's what we've done here. And we've done it in ---- the study by BBC here did it in the most sophisticated way. It looked at all the contracting opportunities of Caltrans. It broke those down by geography, by size of contracts, by types of contracts. And it then surveyed thousands of businesses and compared where they would do the work, what size of contract could they do, what type of contract could they do. And it compared all that vast statistical data to crunch the numbers and come up with the disparities. That's the type of thing that Croson was asking be done. But the other point I want to make about Croson, though, is in Croson, the Supreme Court was addressing a program created by a local municipality. No congressional mandate. The City of Richmond decided it wanted to remedy discrimination in its jurisdiction, and it enacted that program. The Supreme Court gave that, as it should, very strict scrutiny. Contrast that to the program we're dealing with here. Yes, it is strict scrutiny, but it's a program implementing a Federal program, a Federal program that has been upheld by every court that has looked at it as constitutional on its face and as serving a compelling need. So while Croson certainly is the beginning point to look at how these studies should be done, it is addressing a program that is significantly different from the one here where a State is implementing a Federal program that courts have already found to be satisfying a compelling need. The primary difference between, well, there are many differences, but one of them is the question of narrow tailoring and why. You've heard the argument this morning that narrow tailoring needs to be a lot more specific, that it needs to be geographically driven, perhaps even driven within a particular segment of the industry. What's your response to that? My first response is that it's somewhat of a disingenuous argument. And let me explain what I mean by that. You can slice this data in any of a number of ways. You can look at different geographical regions. You can look at different types of work. And we did that. If you look at the BBC disparity study, they have, I think it's 139 pages of tables slicing the data. And if you pull one of those tables out, you may find that a group that ultimately we determined was entitled to be part of the program didn't have a disparity in this region from this date range. Well, if that was the type of evidence we based our program on, if we did exactly what the AGC is suggesting, that we looked at slices of data and said, you know, here you could have a disparity and here this group might be out, but over here it might not be out, they would, as they did in their brief, complain that we were creating an impermissible patchwork of preferences. What we're told by the Federal Government to do is look at the California transportation contracting industry, not looking at little slices of the industry here and there. And we did that. We looked at the industry as a whole. And we looked at what that data shows us as a whole. Yes, you could take one table here or two tables there and find small differences. But if 98 out of 100 tables tell you that African Americans are suffering from a disparity in contracting and two tables don't, you don't look at the two tables. You look at the accumulation of the data. The other thing that is disingenuous about the AGC's argument on this one-size-fits-all that they keep talking about, if they had brought this case the way they typically do, and we've been litigating against each other for decades, and the way they typically bring these cases is on behalf of a contractor who claims I would have gotten this contract but for this system, or I wouldn't have had to use that subcontractor but for this system. Then we would go into how Caltrans does apply this program on a contract-by-contract basis. And for every contract that's awarded, and this is in the record, unrebutted in the record, the Declaration of Mr. Kuhl, K-U-H-L, he explained how we do it on a contract-by-contract basis. We look at that contract in that region for that industry, for that dollar amount, and look at what contractors might be available to do that work. And then we set a goal for that contract. So it's certainly anything but a one-size-fits-all program. It is a very refined administration of a program on a contract-by-contract basis. I've overextended my ten minutes. Thank you. Roberts. Thank you, counsel. Good morning, Your Honors, and may it please the Court. My name is Robert Oren Selstrom on behalf of Intervenors. Intervenors are organizations that represent the interests of DBEs themselves. From our point of view, Caltrans' DBE program is not only clearly constitutional, it is in fact much more modest than it could or should be under existing case precedent. As the record shows, Caltrans continually delayed implementation of its program until finally the federal government stepped in, told Caltrans it was acting in bad faith as DBE participation under a race-neutral program was plummeting to around 2% and trending downward. It was only at that point that Caltrans reimplemented the race-conscious elements of its program. When it did so, it did so based on a very conservative disparity study that is, in fact, much more conservative than disparity studies that have been upheld by the 7th, 8th, and 10th circuits. That resulted in very low goals and with certain groups being left out of the program altogether. All of which is to say that the very limited steps that Caltrans did implement are clearly within constitutional and statutory bounds. Having said that, I want to focus this morning the bulk of my time on the flaws in AGC's arguments, because while we clearly believe that Caltrans' program is more effective than DBE's, there are a number of flaws with AGC's claims. To begin with, there's virtually no evidence in the record, as has been said before. Not only no factual record other than the portions of Ryan's declaration that remain, but no expert testimony at all from AGC. When we brought a Daubert motion against their expert, they immediately withdrew reliance on the expert for purposes of summary judgment. More fundamentally, what AGC misses is the compelling state interest that is at issue here. In the Western States case, this Court said the compelling state interest by the Federal Government is to ensure that Federal funding is not distributed in a manner that perpetuates the effects of either public or private discrimination within the transportation contracting industry. That's Judge O'Scanlan writing for the Court at page 991. Now, that sentence is key, talking about the compelling state interest, talks about perpetuating the effects of discrimination. That's a recognition that the systems, the networks that have built up that exclude my clients and other DBEs have been built up over years, and that Congress has a compelling state interest in breaking those down. It talks about public and private discrimination within the transportation contracting industry. That's a recognition that what Congress is seeking to do here is to break down all the barriers that inhibit DBEs from forming, from growing, and from competing on an equal basis. That is a broadly remedial compelling state interest, and it is telling that AGC never once mentions that in their brief. Their entire argument is that this program is not narrowly tailored. That does not exist in a vacuum. It has to be narrowly tailored to meet the compelling state interest, and that is where AGC fails to grasp the broadly remedial nature of the DBE program. With that in mind, it's easy to see how all of AGC's arguments fail. They come to the Court and say it's impermissible for Caltrans to implement a program that does not show individual cases of contractor-to-contractor intentional discrimination. That's totally at odds with the broadly remedial nature of the DBE program. It's also something that has been specifically rejected by this Court in the AGC 2 case. In the Tenth Circuit, in the Concrete Works case, has also gone into quite a bit of detail about how that is inconsistent with the DBE program. AGC makes other arguments trying to find some support by saying there have to be particular ized findings and saying that what that means is that you have to have contractor-to-contractor specific cases of discrimination. That is an absolute misreading of the case law. Yes, an entity has to have particularized finding of discrimination in order to implement a race-conscious program, but what the Supreme Court has made clear what that means this goes back to the Wigand case where the Court was confronting a Sixth Circuit decision that had said in a teacher layoff case that the school district could rely on general societal discrimination to say kids need role models, and so because societal discrimination has deprived them of that, we can have a teacher layoff plan that is race-conscious. That's what the Supreme Court was rejecting in the Wigand case, saying no, you have to have particularized findings that are linked to the discrimination at issue, and the Court in fact said there, if you want to go have statistical evidence of employment trends to show that there is statistical disparities between available teachers and the teachers in the particular school district, that is particularized findings, statistical evidence that is linked. The following term was the Croson decision where the Supreme Court then took up that exact same issue in the contracting context and, as Caltrans counsel has said, rejected the idea that you could just rely on societal discrimination, said you have to have particularized findings to the particular contracting industry. And that is exactly what Caltrans has done here, a 539-page disparity study that is intricately linked to Caltrans' actual contracting practices. It has the disparity study consultant look at virtually every contract that was entered into by Caltrans during a four-year period, went out and measured availability by interviewing something like 18,000 firms and doing what's called a custom census approach to looking at actual availability of actual firms within California's district. That's a method that has been approved by the Seventh Circuit in the northern contracting case, by the Tenth Circuit in the concrete works case. It is highly and directly linked to Caltrans' specific transportation contracting industry. And that is where it has to be said again, has to be emphasized again, the complete lack of evidence from AGC on this point. No expert, no disparity study, no factual record in order to rebut anything that is in this disparity study that is clearly and directly linked just as the court in the United States Supreme Court said needed to be done in Croson, just as this Court said needed to happen in the Western States case. In fact, we believe that the disparity study is, in fact, more conservative than it needs to be. Our expert that we introduced testimony from on summary judgment, Dr. John Wainwright, is the expert that actually did the disparity studies in the Seventh Circuit, the Eighth Circuit, the Tenth Circuit, those disparity studies that were upheld. He goes through, starting in his declaration with how what BBC did, what the disparity study consultant that Caltrans hired did, was thorough, rigorous, looked at exactly what needed to be looked at, but was conservative, ended up with an availability rate that is actually much less than it should be, a number of exclusions that we pointed out in our papers and it's in Dr. Wainwright's expert report, how, for instance, larger disadvantaged businesses were excluded from BBC's calculations of availability, even though they would meet the size standards under the Federal program, excluded. There's also the issue of capacity. This is something where BBC made exclusions based on the supposed capacity of minority businesses to participate. Dr. Wainwright goes through and explains why doing that can artificially depress DBE availability rates because such matters as size and experience are themselves impacted by discrimination. The exact same thing that the Tenth Circuit said in the Concrete Works case actually makes availability lower if you take those into consideration. Scalia. Counselor, I'm just assuming that you are not addressing the standing issue. We did not raise that in our papers. That's what I thought. I'm not trying to cut you off, but I want counsel to have one more shot at standing if I could. And I appreciate your briefs and I've read a lot of this argument that you're making today, but I just want counsel to address standing for a minute and you're about out of time. Absolutely. Thank you, Your Honors. Counselor, it seems to me that the argument by the opposition is that the allegations in the complaint are sufficient enough to meet what we need to do in this particular instance, and the Lujan does not control. How do you respond to that? Well, I'm a little caught off guard because that argument wasn't raised in the reply brief. The only citation to Northeastern contractors in the reply brief is actually a citation that supports our position on standing. And if the Supreme Court held that in Northeastern, it would be directly conflicting with Lujan and directly conflicting with a more recent decision in Summers, where the Court said specifically that standing needs to be evaluated at every stage, both in the district court and on appeal. And that's the reason this didn't get raised in the district court is because we were basing the arguments and the allegations on the complaint. And then there was the Ryan Declaration, which we attacked, but it's not until the Court rules and says most of the Ryan Declaration is now out of here that standing essentially evaporates, because if those – if the Court were to have accepted those allegations in the Ryan Declaration, arguably they would have met the general standard for standing. Now, on appeal, the record is clear. It could be clearer, I agree, about what was stricken and what was not. I think if you look at the Court's transcript at page 6 is where the Court says what he believes should be stricken and shouldn't be. All right. Well, I've read the Court's transcript pretty well from 6 through 63, trying to determine what we've got here, and I'm having a tough time. So I just wanted you to respond to that one particular case. Thank you. Thank you. Thank you, Your Honor. I would just like to read some language specifically from the northeastern Florida case. To establish standing, therefore, a party challenging a set-aside program like Jacksonville's need only demonstrate that it is able and ready to bid on contracts and that a discriminatory policy prevents it from doing so. It has nothing to do with whether a contract has been denied. Well, I'm not so worried about that. I kind of understand the standard. My worry is that the complaint is sufficient to meet the standard, because I find nothing else. And here's the language furthermore from the Supreme Court, Your Honor. Where are you? In its complaint, Petitioner alleged that its members regularly bid on construction contracts and that they would have bid on contracts set aside pursuant to the city's ordinance were they so able. Because these allegations have not been challenged by way of a motion for summary judgment, for example, we must assume that they are true. I would also like to respond to arguments regarding instances of discrimination. Would you refresh my recollection? Did you submit a verified complaint? Well, with a verified complaint, no, we didn't, Your Honor. Do you know if a verified complaint was at issue in northeastern Florida contractors?  No, Your Honor. Regarding instances of discrimination, in Croson, the Court noted this. Since 1975, the City of Richmond has had an ordinance on the books prohibiting both discrimination in the award of public contracts and employment discrimination. The complete silence of the record concerning enforcement of the city's own anti-discrimination ordinance flies in the face of the dissent's view of a tight-knit industry which has prevented minorities from obtaining contracts. So there, the Supreme Court is saying evidence that there are no instances of discrimination is relevant and probative. But Croson really isn't our type case. You'd agree with that, wouldn't you? I mean, this is the City of Richmond, their own program. This is a federally mandated task for Caltrans to undertake. In western States, this Court relied on Croson to find that the Washington program was unconstitutional, and it invalidated it because it was not narrowly tailored to the specific minority groups. Right. But it did approach it on a statewide basis. And that's in western state, in western paving. That's because there was no. Right. There was no evidence in the record as to what the realities of the local labor market were. And I will like to add. Why do you think that's important in terms of implementing a statewide program? I mean, I look at Croson and it's confined to the geography at issue, which is the City of Richmond. Western States Paving talked about tailoring it to the industry. And Croson uses the same language. So what leads you to believe that Caltrans can't satisfy the standard by using statewide data? The reason it cannot is just because the data does show that it would not be narrowly tailored. And also, going back to what Croson said about the proper use of statistics, it said that the proper basis for comparison are those qualified minority contractors who are ready, willing, and able to bid on construction contracts. You cannot mix contractors that have different qualifications. And here the evidence in the record shows that construction engineering, the construction contractors have different experiences, different licenses, different qualifications than engineers. But let's not go to the point of bidding on a challenge to a specific contract as opposed to a statewide program. Well, the realities of the market in California is that there are two different industries. And Caltrans administers local assistance contracts to local agencies. And it requires those agencies to give preferences from this one-size-fits-all preference program, even though the disparities, and it's in the disparity study, the disparities at each district are different. But I assume that your members bid on contracts that are outside the confines of San Diego, right? That is correct, Your Honor. So why is a geographically confining approach make any sense at all in terms of a statewide contracting industry where you have members bidding from different cities, bidding on contracts outside their geographic area? Because the disparity study shows that the disparities are different. They're different with the construction industry. They're different on the engineering industry. And they're different district by district. So imposing this one-size-fits-all remedy, it lacks narrow tailoring. It exacerbates disparities because one group that would not have or, excuse me, one group for which there is no disparity would receive a preference. And that's one group for which there are, well, I've lost my train of thought. But the point is it's not narrowly tailored to that aspect. And that's a critical function of strict scrutiny. And for that reason, the program fails strict scrutiny. Thank you, counsel. Thank you, Your Honor. The case just heard will be submitted for decision. And we'll take a ten-minute recess. Thank you, Your Honor.
judges: Farris, Thomas, Smith